# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
# HATTIESBURG DIVISION

**JAMES M. KITCHENS**                                              **PLAINTIFF**

**versus**                                **CIVIL ACTION NO. 2:10-cv-00273-KS-MTP**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security**                                        **DEFENDANT**

## REPORT AND RECOMMENDATION

Plaintiff James Kitchens brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner denying his claim for a period of disability and disability insurance benefits under the Social Security Act. The matter is now before the court on Defendant's Motion to Affirm the Decision of the Commissioner [9] and on Plaintiff's Motion for Judgment on the Pleadings [7]. Having considered the pleadings, the transcript of the record, and the applicable law, and being thus fully advised in the premises, the undersigned recommends that the Commissioner's decision be AFFIRMED.

## PROCEDURAL HISTORY

Plaintiff filed an application for period of disability ("POD") and disability insurance benefits ("DIB") under Title II of the Social Security Act on January 10, 2008, alleging disability beginning on November 7, 2006. ([5-3] at 2). The Commissioner denied Plaintiff's initial claim on March 5, 2008, and denied his claim upon reconsideration on July 18, 2008. *Id.* at 2-3. Plaintiff requested a hearing on September 12, 2008. ([5-4] at 13-14).

On May 8, 2009, Administrative Law Judge ("ALJ") Ann Farris held the requested hearing. ([5-2] at 32). The ALJ heard testimony from Plaintiff and Thomas Stewart, a vocational expert ("VE"). *Id.* at 32-54. On July 30, 2009, the ALJ issued a decision finding that Plaintiff was

not disabled under Sections 216(i) and 223(d) of the Social Security Act. *Id.* at 10-20.

Plaintiff appealed, and on August 25, 2010, the Appeals Council denied Plaintiff's request for review, finding there was no basis for changing the decision of the ALJ, thereby rendering the ALJ's decision the final decision of the Commissioner. ([5-2] at 1-4). Plaintiff filed a Complaint [1] in this court on August 9, 2011, seeking an order reversing the Commissioner's final decision and awarding him benefits, or remanding the case to the Commissioner for further administrative action as directed by the court. The Commissioner answered [4] the complaint denying that Plaintiff is entitled to any relief. The parties having filed dispositive Motions [7] [9] pursuant to the Local Standing Order [3], the matter is now ripe for decision.

## MEDICAL/FACTUAL HISTORY

Plaintiff was forty-four years old at the time of the alleged onset date.[1] ([5-7] at 40). On November 7, 2006, Plaintiff fell approximately 10-15 feet from a forklift while at work, resulting in both a left distal tibia and fibula pilon fracture. *Id.* at 50. On December 1, 2006, Dr. Inez Kelleher performed surgery on Plaintiff's broken ankle, noting Plaintiff "tolerated the procedure well." *Id.* at 6-8. Plaintiff had not experienced any major problems and was not in any apparent distress when he was seen by Dr. Kelleher for a follow-up appointment on December 12, 2006. *Id.* at 119.

In March of 2007, Plaintiff went to Memorial Hospital for nonunion[2] and malalignment of his left ankle. ([5-7] at 39-40). Dr. Kelleher performed a bone grafting, external fixator exchange,

---

[1]Plaintiff is defined as a younger individual on the alleged onset date, which includes individuals ages 18-44. 20 C.F.R. § 404.1563.

[2]Nonunion is defined as "failure of the ends of a fractured bone to unite." Dorland's Illustrated Medical Dictionary at 1232 (29th ed. 2000).

2

and realignment procedure. *Id.*

On July 5, 2007, Plaintiff complained of pain in his left ankle, caused by a pin infection in his left tibia. ([5-7] at 64). He was admitted to the hospital, put on antibiotics, and underwent surgery to have the pins removed. *Id.* at 65, 66, 92. On July 26, 2007, Plaintiff attended a follow-up appointment complaining of pain in his ankle affecting his range of motion. *Id.* at 93. His x-rays showed normal alignment and no changes, and Dr. Kelleher noted Plaintiff had not experienced any significant problems or apparent distress. *Id.* On August 15, 2007, Plaintiff saw Dr. Kelleher for a possible posterolateral bone grafting, but Dr. Kelleher noted that there was good healing callus[3] joining the proximal and distal fragments together and that the bone graft was not necessary. ([5-7] at 72-73). Plaintiff's external fixator was removed. *Id.*

On August 27, 2007, during another follow-up appointment with Dr. Kelleher, Plaintiff said he was doing "very well" and could walk "without severe pain." ([5-7] at 89-90). Plaintiff's incisions had healed properly, and he was in no apparent distress. *Id.* Dr. Kelleher noted Plaintiff would most likely have post-traumatic arthritis in his ankle, which may require a fusion in the future. *Id.* Dr. Kelleher anticipated that Plaintiff would not be able to return to work full-time for two or three more months but that light-duty work was possible within six weeks. *Id.* at 90.

On September 24, 2007, Plaintiff attended a follow-up appointment with Dr. Kelleher. ([5-7] at 86). Dr. Kelleher noted that Plaintiff had been in physical therapy, and had "actually come along quite well." *Id.* Upon examination, Plaintiff had good subtalar[4] joint motion, good forefoot

---

[3]Callus is defined as "localized hyperplasia of the horny layer of the epidermis due to pressure or friction." *Id.* at 266.

[4]Subtalar means "inferior to the talus." Dorland's at 1722. The talus is "the highest of the tarsal bones and the one that articulates with the tibia and fibula to form the ankle joint." *Id.* at

3

motion, he was neurovascularly intact distally, had no erythema, and his incisions had healed properly. *Id.* His injuries were described as "healed" and he was told to continue physical therapy for another two weeks, then continue with rehabilitation on his own. *Id.* X-rays of Plaintiff's ankle revealed the tibia and fibula were healing properly, and his condition was described as stable. *Id.* at 87.

On November 27, 2007, Dr. Kelleher gave Plaintiff an injection in his ankle joint, which Plaintiff admitted significantly decreased his ankle pain. ([5-7] at 85). Further, Plaintiff utilized an ankle-foot orthosis brace (hereinafter "ankle brace"), which "completely remove[d]" his pain while walking. *Id.* Dr. Kelleher informed Plaintiff that he would be a good candidate for ankle fusion in the future, if less intrusive methods failed. *Id.*

In February 2008, Plaintiff requested to proceed with an ankle fusion, because his wife was having a baby, and he wanted to be able to care for his child when his wife was away. ([5-8] at 24). Plaintiff admitted that he had done well with the ankle brace, but said he could not walk without it. *Id.*

On February 28, 2008, Dr. Thomas Jeffcoat, a state agency physician, reviewed the evidentiary record and assessed Plaintiff's physical residual functional capacity ("RFC").[5] ([5-7] at 121-28). In Dr. Jeffcoat's opinion, Plaintiff could lift or carry fifty pounds occasionally, lift or carry twenty-five pounds frequently, stand or walk for six hours in an eight-hour work day, sit for six hours in an eight-hour work day, and push and pull with some lower extremity limitations. *Id.*

---

1787.

[5]"Residual functional capacity" is defined in the Regulations as the most an individual can still do despite the physical and/or mental limitations that affect what the individual can do in a work setting. 20 C.F.R. § 416.945.

4

at 122. Dr. Jeffcoat noted that Plaintiff had good subtalar motion, his foot and ankle looked good, and he was ambulating well. *Id.* However, Plaintiff did suffer from a decreased range of motion. *Id.*

On May 13, 2008, Plaintiff followed up with Dr. Kelleher. ([5-7] at 130). Dr. Kelleher noted that the swelling in Plaintiff's foot and ankle had decreased, his subtalar joint motion had improved, and he had some decreased range of motion in his ankle. *Id.* Plaintiff walked with a "slight" limp when wearing his ankle brace, and although he continued to have calf atrophy, it had "significantly improved." *Id.* An x-ray of Plaintiff's ankle showed stable alignment, increasing sclerosis along the fracture line of the distal tibia, a healed fracture of the distal tibia resulting in at least mild post-traumatic deformity, moderately advanced degenerative changes, and residual slight swelling of his ankle and hind foot. *Id.* at 133. According to Dr. Kelleher, Plaintiff could return to light-duty or sedentary work. *Id.* at 130.

In August 2008, Plaintiff reported to Dr. Kelleher that he tried to return to light-duty work, but his employer wanted him to work on a ladder, which did not conform with Plaintiff's restrictions. ([5-8] at 16). On October 16, 2008, Dr. Kelleher found that Plaintiff could return to a "moderate work level," but should refrain from climbing, kneeling, or crawling. *Id.* at 14. Dr. Kelleher noted that Plaintiff walked well when he wore his ankle brace but experienced significant pain without it. *Id.*

On February 11, 2009, Plaintiff saw Dr. Kelleher, complaining of ankle pain. ([5-8] at 5). Dr. Kelleher noted that Plaintiff suffered no apparent distress, his incisions had healed well, and he had a good range of motion of his left toes. *Id.* at 5-6. Plaintiff was neurologically intact, but claimed he had pain in his ankle when he removed his ankle brace. *Id.* at 6. Plaintiff conceded that

his pain was controlled when he wore his ankle brace but that he preferred to proceed with an ankle fusion. *Id.* at 7. On February 11, 2009, Plaintiff underwent surgery for ankle arthrodesis of his left ankle and fibula hardware removal. *Id.* at 7-9. On February 23, 2009, following the fusion, Plaintiff was doing "very well," showed no apparent distress, and his only complaint concerned skin inflamation on his thigh. *Id.* at 12.

On April 9, 2009, Plaintiff attended a follow-up appointment with Dr. Kelleher. ([5-8] at 10). Plaintiff had taken his cast off because it had gotten wet, and used his ankle brace instead. *Id.* X-rays revealed that the fusion had healed well, and Plaintiff was not in any significant pain or apparent distress. *Id.*

At the administrative hearing on May 8, 2009, Plaintiff testified that a typical day for him involved caring for his two-year-old son while his wife was at work and carrying out household chores. ([5-2] at 41-44). Plaintiff admitted he was able to cook, feed the dog, wash dishes, do laundry, attend church, drive his car, and do some grocery shopping. *Id.* Further, Plaintiff testified he was able to stand for twenty to thirty minutes before his ankle troubled him. *Id.* at 39.

Mr. Thomas Stewart, a VE, testified that a person of the same age, with the same education, the same vocational experience, and the same RFC as Plaintiff was capable of performing several other jobs existing in large number in the national economy. ([5-2] at 49-52). The jobs included working as a gate attendant, a ticket taker, and a private-sector dispatcher. *Id.* at 50-53.

**BURDEN OF PROOF**

In *Harrell v. Bowen,* 862 F.2d 471, 475 (5th Cir. 1988), the Fifth Circuit detailed the shifting burden of proof that applies to the disability determination:

An individual applying for disability and SSI benefits bears the initial burden of proving that he is disabled for purposes of the Social Security Act. Once the claimant satisfies his initial burden, the [Commissioner] then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and therefore, not disabled. In determining whether or not a claimant is capable of performing substantial gainful activity, the [Commissioner] utilizes a five-step sequential procedure set forth in 20 C.F.R. § 404.1520(b)-(f) (1988):

>1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.
>2. An individual who does not have a 'severe impairment' will not be found to be disabled.
>3. An individual who meets or equals a listed impairment in Appendix 1 of the regulations will be considered disabled without consideration of vocational factors.
>4. If an individual is capable of performing the work he has done in the past, a finding of 'not disabled' must be made.
>5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can be performed.

(citations and footnotes omitted). A finding that a claimant "is disabled or not disabled at any point in the five-step process is conclusive and terminates the . . . analysis." *Harrell*, 862 F.2d at 475.

## THE ADMINISTRATIVE LAW JUDGE'S ANALYSIS IN THIS CASE

As stated above, Plaintiff's initial hearing before ALJ Farris occurred on May 8, 2009. ([5-2] at 32). On July 30, 2008, the ALJ issued a final decision that Plaintiff was not disabled, and, therefore, not entitled to POD or DIB. *Id.* at 19.

As an initial matter, the ALJ found Plaintiff had met the insured status requirements of the Social Security Act through December 31, 2011. ([5-2] at 15). At step one of the five-step

7

evaluation process,[6] the ALJ found Plaintiff had not engaged in any substantial gainful activity since November 7, 2006, the alleged onset date. ([5-2] at 15). At step two, she found that Plaintiff suffered from the following severe impairments: status post crush injury to the left ankle with residual deformity and post-traumatic arthritis eventually requiring fusion of the left ankle. *Id*.

At step three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Section 404, Subpart P, Appendix 1. ([5-2] at 15). More specifically, the ALJ determined Plaintiff's impairments did not meet or medically equal the requirements of Listings 1.02 and 1.03, because Plaintiff was successfully walking with a cane less than twelve months after his initial injuries and all surgeries. *Id*. Next, the ALJ assessed Plaintiff's RFC, and found that he retained the capacity to perform sedentary work as defined in 20 C.F.R. Section 404.1567, Subpart P,[7] with the limitation that he should alternate between sitting and standing approximately every thirty minutes to one hour, and should not do any climbing or balancing. ([5-2] at 16). In making this determination, the ALJ considered Plaintiff's symptoms and the extent to which they can be reasonably accepted as

---

[6]The ALJ applied the five-step evaluation process set forth in 20 C.F.R § 404.1520(a) and 20 C.F.R § 416.920(a).

[7]Sedentary work is defined in the C.F.R. as:
[W]ork [that] involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

consistent with the objective medical evidence and other evidence,[8] and also considered the opinion evidence.[9] ([5-2] at 16).

At step four, the ALJ found Plaintiff was unable to perform any past relevant work (a construction welder, which is medium in exertional demand, but heavy when actually performed, and skilled in character with a specific vocational preparation level of seven), because the exertional demands of his past work exceeded his RFC. ([5-2] at 19). Finally, at step five, the ALJ concluded Plaintiff could perform several jobs of which there are a significant number in the national economy. *Id.* The ALJ based this conclusion on Plaintiff's age, education, work experience, RFC, and the testimony from the VE. *Id.* These jobs are a private-sector dispatcher, a gate guard, and a ticket taker. *Id.* at 20. Accordingly, the ALJ found that Plaintiff was not disabled. *Id.*

## STANDARD OF REVIEW

This Court's review of the Commissioner's decision is limited to inquiry into whether there is substantial evidence to support the Commissioner's findings and whether the correct legal standards were applied in evaluating the evidence. *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is "more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Hames v. Heckler,* 707 F.2d 162, 164 (5th Cir. 1983). To be substantial, the evidence "must do more than create a suspicion of the existence of the fact to be established." *Hames,* 707 F.2d at 164 (citations omitted). However, "[a] finding of no substantial evidence is appropriate only if no

---

[8] *See* 20 C.F.R. § 404.1529 and SSRs 96-4p and 96-7p.

[9] *See* 20 C.F.R. § 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p.

credible evidentiary choices or medical findings support the decision." *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001) (internal citations and quotations omitted). Conflicts in the evidence are for the Commissioner, not the courts, to resolve. *Selders v. Sullivan,* 914 F.2d 614, 617 (5th Cir. 1990). A court may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for the Commissioner's, "even if the evidence preponderates against" the Commissioner's decision. *Harrell*, 862 F.2d at 475. If the decision is supported by substantial evidence, it is conclusive and must be affirmed. *Selders,* 914 F.2d at 617. Moreover, "'[procedural perfection in administrative proceedings is not required' as long as 'the substantial rights of a party have not been affected.'" *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007) (quoting *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988)).

## THE ISSUE

### Whether the ALJ Erred in Finding Plaintiff's Ankle Impairments did not Meet or Medically Equal Listings 1.02 and 1.03.

Plaintiff claims that his ankle impairment satisfies the requirements of Listing 1.02, major dysfunction of a joint, and Listing 1.03, reconstructive surgery or surgical arthrodesis[10] of a major weight bearing joint. Pl.'s Memo. [8] at 3. In order to order to satisfy Listing 1.02, Plaintiff must first show that he has:

> Major dysfunction of a joint(s) (due to any cause): Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space narrowing, bony destruction, or

---

[10]Arthrodesis is "the surgical fixation of a joint by a procedure designed to accomplish fusion of the joint surfaces by promoting the proliferation of bone cells." Dorland's at 152.

10

ankylosis[11] of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b . . . .

20 C.F.R. Part 404, Subpart P, Appendix 1.

In order to satisfy Listing 1.03, Plaintiff must show that he has undergone:

> Reconstructive surgery or surgical arthrodesis of a major weight-bearing joint, with inability to ambulate effectively, as defined in 1.00B2b, and return to effective ambulation did not occur, or is not expected to occur, within 12 months of onset.

20 C.F.R. Part 404, Subpart P, Appendix 1.

The inability to ambulate effectively is defined in 1.00B2b as:

> [A]n extreme limitation of the ability to walk; i.e., an impairment that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 101.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

*Id.*

Further, 1.00B2b(2) provides that an individual is able to ambulate effectively if the individual is:

> [C]apable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

---

[11]Ankylosis is "immobility and consolidation of a joint due to . . . surgical procedure." *Id.* at 91.

11

20 C.F.R. Part 404, Subpart P, Appendix 1.

Plaintiff argues that he "had a complicated recovery from his initial injury" and he "unquestionably could not ambulate effectively." Pl.'s Memo. [8] at 2. Plaintiff further argues that his course of treatment record proves that he could not ambulate effectively due to ankle pain, which eventually required an ankle fusion. At the hearing, Plaintiff testified that he sometimes required crutches to walk, and generally had difficulty walking more than twenty yards. ([5-2] at 42, 48).

Conversely, the Commissioner argues that substantial evidence supports the ALJ's determination that Plaintiff could ambulate effectively. Def.'s Memo. [10] at 10. The record reflects that on November 6, 2007, Plaintiff's physician, Dr. Kelleher, noted that Plaintiff was ambulating well enough to continue "doing work on his farm." ([5-7] at 82). Dr. Kelleher's examination revealed good subtalar joint motion, good forefoot motion, no erythema, well-healed pin sites, and inward flexibility of ten degrees. *Id.* at 86.

Throughout his recovery, Plaintiff was able to care for his baby, help out with household chores, feed his dogs, cook, wash dishes, do laundry, drive his car, shop for groceries, and attend church. ([5-2] at 16, 41-44). Dr. Kelleher continuously described Plaintiff as "doing well," moving without significant pain, and "being in no acute distress." ([5-7] at 39, 64, 86, 89, 93; [5-8] at 5, 10, 12). The ALJ found "a preponderance of the evidence does not establish that the claimant experiences pain of such severity, intensity, and duration . . . to preclude him from performing a range of sedentary work as reflected in the determined [RFC]." ([5-2] at 18). *See Gulliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) (the ALJ reasonably discounted complaints of pain

where "[d]uring several examinations by a treating physician . . . Gulliams appeared to be in no significant distress.").

Dr. Kelleher acknowledged that Plaintiff had experienced pain if he attempted to walk without his ankle brace. ([5-8] at 7, 14, 24). However, even assuming that Plaintiff had difficulty ambulating effectively, his pain was controlled and limited when he used his ankle brace, and Dr. Kelleher found Plaintiff was "doing very well in his brace." *Id.* at 7, 10, 14, 24. In addition, Plaintiff's pain significantly improved when he received intra-articular injections.[12] ([5-7] at 85). Dr. Kelleher, moreover, found that Plaintiff's pain was "completely remove[d]" as long as he used his ankle brace. *Id.* At the hearing, Plaintiff testified that as long as he wore his brace, he was able to remain standing for up to thirty minutes at a time. ([5-2] at 41).

Finally, as noted by Defendant, neither Dr. Kelleher nor the state agency's physician, Dr. Jeffcoat, found Plaintiff's ankle injury hindered his ability to ambulate effectively, as required by the above mentioned Listings. ([5-7] at 89-90, 130; [5-8] at 14, 20). On August 27, 2007, Dr. Kelleher found that Plaintiff would probably not be able to return to full-time work for two or three more months, but that he might be capable of light-duty work within six weeks. ([5-7] at 89-90).[13] After reviewing the medical record, Dr. Jeffcoat found that Plaintiff was capable of walking or standing six hours in an eight-hour workday, frequently lifting twenty-five pounds, occasionally lifting fifty pounds, and sitting for six hours in an eight-hour workday. *Id.* at 122. Further, Dr.

---

[12]The injections consisted of 2.5 mL of Hyalgan, which mitigated Plaintiff's pain for approximately six months at a time. ([5-7] at 85).

[13]At a later visit, Dr. Kelleher noted, "I think that we can decrease the pain and he can get back to a moderate work level that does not require any climbing, kneeling or crawling type activities. This was discussed with the patient at his last visit." ([5-8] at 14).

Jeffcoat found that Plaintiff was capable of frequently balancing, stooping, kneeling, crouching, crawling, and that he could occasionally climb stairs or ramps. *Id.* at 123. If the state agency physician's opinion is consistent with the evidentiary record, then it constitutes substantial evidence in support of the ALJ's decision. *See Tremblay v. Sec'y of Health and Human Servs.*, 676 F.2d 11, 13 (1st Cir. 1982); *Smith v. Schweiker*, 795 F.2d 343, 345-46 (4th Cir. 1986); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir. 1984).

Plaintiff argues that the ALJ's finding heavily relied on the fact that Plaintiff could walk with a single cane. Pl.'s Memo. [8] at 5. Plaintiff correctly points out that the definition of ineffective ambulation is not limited to a person who must use two canes. However, Plaintiff has not proven that his inability to ambulate effectively conforms to the other criteria required by the listings. Although Plaintiff used crutches throughout his surgeries, he admitted that he no longer required the crutches three weeks after his last surgery and was able to walk with a walking cane. ([5-2] at 39-40). Further, by November of 2007, Plaintiff was able to ambulate well enough to work on his farm, although he did experience pain while doing so. ([5-7] at 82). As mentioned above, with the use of his ankle brace, Plaintiff is able to ambulate effectively with limited pain. ([5-8] at 7, 10, 14, 24). Further, Plaintiff admitted that his impairment has not prevented him from carrying out household chores, driving his car, or caring for his child. ([5-2] at 41-44).

Plaintiff cites his medical history in an effort to support his position. Pl.'s Memo. [8] at 5-6. However, this does not objectively establish that he is unable to ambulate effectively. As noted by Defendant, these references merely include his treatments, surgeries, and diagnoses, but Plaintiff's medical record does not show that he is unable to ambulate effectively. Step three requires Plaintiff to prove that his impairments conform to the requirements of a listed

impairment,[14] and Plaintiff failed to satisfy his burden of proof.

## CONCLUSION/RECOMMENDATION

The undersigned agrees with the Commissioner's decision that Plaintiff is not entitled to POD or DIB under the Social Security Act for the period at issue, and finds that the decision is supported by substantial evidence and utilizes correct legal standards. It is, therefore, the recommendation of the undersigned that the Commissioner's Motion to Affirm [9] be granted and the denial of benefits affirmed. The undersigned further recommends that Plaintiff's Motion for Judgment on the Pleadings [7] be denied.

## NOTICE OF RIGHT TO OBJECT

In accordance with the rules, any party within fourteen days after being served a copy of this recommendation, may serve and file written objections to the recommendations, with a copy to the judge, the magistrate judge and the opposing party. The District Judge at the time may accept, reject or modify in whole or part, the recommendations of the Magistrate Judge, or may receive further evidence or recommit the matter to this court with instructions. The parties are hereby notified that failure to file written objections to the proposed findings, conclusions, and recommendations contained within this report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the proposed factual findings and legal conclusions accepted by the district court to which the party has not objected. *Douglass v. United Servs. Auto. Ass'n,* 79 F.3d 1415, 1428-29 (5th Cir. 1996).

THIS the 20th day of June, 2012.

---

[14]*See* 20 C.F.R. § 404.1520(d).

s/ Michael T. Parker
United States Magistrate Judge